976 F.2d 724
 NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
Carmen MORALES, Plaintiff, Appellant
v.
SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant, Appellee.
 No. 92-1246.
 United States Court of Appeals,
First Circuit.
 Sept. 29, 1992
 
 Appeal from the United States District Court for the District of Puerto Rico [Hon. Jose Antonio Fuste, U.S. District Judge]
 Francisco J. Hernandez-Rentas on brief for appellant.
 Daniel F. Lopez Romo, United States Attorney, Jose Vazquez Garcia, Assistant United States Attorney, and Joseph E. Dunn, Assistant Regional Counsel, Office of the General Counsel, Department of Health & Human Services, on brief for appellee.
 D.Puerto Rico
 AFFIRMED.
 Before Breyer, Chief Judge, Campbell, Senior Circuit Judge, and Cyr, Circuit Judge.
 Per Curiam.
 
 
 1
 Claimant, Carmen Morales, appeals from a district court decision affirming the denial of her application for Social Security disability benefits for the period between September, 1981 and December, 1986. Claimant alleges mental and physical impairments. The Administrative Law Judge (ALJ) concluded that, taken together, claimant's impairments are severe and prevent her from performing her past work as a cook, but would not preclude her from performing a significant number of other jobs in the national economy. We affirm.
 
 BACKGROUND
 
 2
 Claimant was born in 1944 and has a ninth grade education. She worked as a cook in a school cafeteria until September, 1981, when her disability allegedly commenced. She has been unemployed since then. Claimant was granted disability benefits by the Commonwealth of Puerto Rico Retirement Systems Administration. Claimant filed an application for Social Security disability benefits on August 2, 1985, alleging a "nervous condition." Subsequently, she also alleged poor circulation and pain in her legs and feet. Claimant's insured status expired on December 31, 1986.
 
 
 3
 Following denial of her application, claimant obtained a hearing before the ALJ on October 5, 1987. Following testimony by the claimant, Dr. Rafael Nogueras, a psychiatrist, testified as a medical advisor at the request of the ALJ. The ALJ concluded that "the combined effect of claimant's musculoskeletal and mental components amount to a severe impairment," but that, at the time her insured status expired, claimant's impairment did not prevent her from performing her past work as a cook. Therefore, the ALJ concluded that claimant was not entitled to disability benefits.
 
 
 4
 Claimant appealed the ALJ's decision to the district court, which in an opinion dated July 19, 1989 remanded the case on the ground that the ALJ gave inadequate consideration to claimant's complaints of pain in her heels. The district court faulted the ALJ for failing to properly apply the guidelines set forth in Avery v. Secretary of Health and Human Services, 797 F.2d 19 (1st Cir. 1986) for evaluation of residual functional capacity ("RFC") for subjective complaints of pain.
 
 
 5
 On remand, the ALJ conducted a supplemental hearing on February 8, 1990, at which both claimant and a vocational expert ("VE") testified. In an opinion dated February 26, 1990, the ALJ modified his original findings and concluded that claimant's RFC "is limited to a light work level of exertion, of unskilled, simple nature where she can alternate positions at will" and, therefore, claimant is unable to perform her past work as a cook. Based upon the VE's testimony on the local availability of a significant number of jobs which claimant could perform, the ALJ again concluded that claimant was not entitled to benefits. The Appeals Council affirmed the ALJ's decision.
 
 
 6
 Claimant again appealed to the district court on the ground that there was not substantial evidence to support the Secretary's decision. The district court concluded that, with respect to claimant's complaints of pain, the ALJ had fulfilled the requirements of Avery. The district court admonished the ALJ, however, for complying with the letter but not the spirit of the Avery decision and stated that it would prefer more specific findings supporting the ALJ's reasoning. Concluding that the Secretary had substantial evidence to support his finding that claimant was not disabled, the district court affirmed the denial of benefits.
 
 MEDICAL EVIDENCE
 A. Mental Impairment
 
 7
 The record contains medical reports prepared in November, 1982 and December, 1983 by treating physicians in connection with claimant's application for disability benefits from the Puerto Rico Retirement System. The record also includes reports from doctors at the Arecibo Mental Health Center where claimant was treated, on and off, as an out-patient from January, 1983 through February, 1986. In addition, the record contains reports from claimant's treating psychiatrist, Dr. Llado, and from three consulting psychiatrists who examined claimant, Dr. Mojica, Dr. Guillen and Dr. Toro. Finally, the record contains the testimony of the medical advisor, Dr. Nogueras, a non-examining consulting psychiatrist who reviewed the claimant's medical records.
 
 
 8
 In a November, 1982 report, based on monthly examinations since September, 1981, the examining physician reported that claimant complained of "insomnia, agitation and crying spells, apparently without reason." The diagnosis was "anxiety neurosis with depression." There is no indication that medication was prescribed for this condition.
 
 
 9
 The first report from the Arecibo Mental Health Center, dated January, 1983, describes claimant's symptoms as follows: "frequent headaches, asphixiation, shortness of breath, pain in the side of the heart. Says that when she tries to speak in places where there are groups of people, she feels her mouth trembles. Cries frequently ... Forgetful. Starts screaming because she develops nightmares." The diagnosis is "anxiety disorder with depressive traits." The report recommends medical evaluation and individual therapy.
 
 
 10
 Subsequent reports from the Mental Health Center visits for February, April, May and August indicate that the claimant reported that "the medication" (unspecified) helps her. In September, 1983, claimant said that the treatment had been helping her. In November, 1983, claimant was discharged from the Center because she indicated that she wished to continue treatment with a private psychiatrist.
 
 
 11
 In August, 1984, claimant returned to the Center to continue treatment. In September, 1984, she "appeared anxious and depressed. Cried during the interview." In March, 1985, the report indicates that claimant said she felt "fair" and that the medication that helped her most was "Tranxene 7.5 mg HS." In June, 1985, she said that the medication still helped her, but that after she stopped taking hormones prescribed following her recent hysterectomy, she developed "flushes" and became nervous. In September, 1985, claimant reported that "sometimes she starts screaming without any reason" and that she now takes her medication twice a day. The report from the claimant's November visit indicates that "on some days she feels better, others she feels worse," that she still takes her medication twice a day and that it helps her. The report from her December, 1985 visit indicates that she "appears depressed." Claimant indicated that she "feels controlled only with the use of the medication" and that she "doesn't tolerate being in groups of people, tends to isolate herself." Finally, in her last visit (February 1986) to the center during the relevant period, claimant stated that she felt "fair" but that her application for Social Security benefits caused her to feel nervous. She also complained of "tachicardia" and that her heart "trembles." Claimant indicated that the medication helps her.
 
 
 12
 On August 27, 1985, claimant was examined by Dr. J. A. Mojica Sandoz, a psychiatrist, for the purpose of evaluating her eligibility for Social Security disability payments. At the interview, claimant admitted upon questioning to experiencing "insomnia, headaches, dizzy spells and moments of easy irritability." She reported that she was taking Tranxene 7.5 at bedtime but that "they don't do anything to me." The report also indicated that claimant was taking analgesics. Claimant reported that she lives with her employed husband and teenage son and that she does the household chores (except for the shopping).
 
 
 13
 Dr. Mojica reported that he "could not detect anything remarkable regarding her attitude or behavior. She answered every question asked." He added that "she was slightly anxious and tense" and that "the affectivity prevailing during the examination was of a depressive nature," but that she was "accessible, cooperative and frank ... The progress of her thought was of a normal tempo. She was spontaneous and expressed herself in a logical, lucid, coherent and relevant form." She did not exhibit any difficulty with establishing interpersonal relations. Her "capacity for remote, intermediate and recent memory was adequate." She was normally oriented in time, place and person. Her capacity for judgment was "adequate," and she was "mentally competent to handle her funds in an adequate and rational manner." Dr. Mojica's diagnosis was of a mild dysthymic disorder. The secondary diagnosis was of a histrionic personality disorder.
 
 
 14
 The first report of Dr. Victor J. Llado, claimant's treating psychiatrist, is dated September 3, 1985. Claimant had been receiving psychiatric treatment from Dr. Llado since October, 1983. Dr. Llado describes claimant's symptoms as follows: "a combined picture of depressive states and anxiety attacks, including mild-to-moderate insomnia, overall feeling of nervousness, sadness, tiredness, and aloofness." Claimant reported to Dr. Llado that she stays home most of the day, doesn't handle any money and has handed over all responsibilities to family members. She denied "doing any chores or engaging in any tasks or meaningful activities at home." (In contrast to Dr. Llado's picture of inactivity however, was claimant's own description of functions in her August 1985 application where she said she took care of household chores, did the cooking, went shopping with her husband, and did some gardening.)
 
 
 15
 Dr. Llado's report contains the following description of claimant's mental status: "The claimant was alert, well oriented as to time, place, and person"; "The claimant's social judgment and reality testing seemed intact"; "The claimant's thought processes were intact"; "The content was appropriate, relevant, simple, scanty, but commensurate with the claimant's socio-demographic characteristics." There was no evidence of perceptual disturbances or memory deficits. Dr. Llado reported that claimant wept from time to time during the meeting and evidenced a "mild-to-moderate level of psychomotor retardation" and "easy distractibility with poor concentration throughout the meeting."
 
 
 16
 Dr. Llado diagnosed claimant as having a chronic, severe generalized anxiety disorder. The doctor concluded that "claimant's emotional condition is rather severe" and that the prognosis is poor. In his opinion, claimant's emotional condition, including a "poor sense of self," seriously limits the claimant and makes her very vulnerable to the ordinary stresses of employment. He felt she could not "meet the occupational and performance levels demands of a regular competitive job market."
 
 
 17
 Dr. Llado's second psychiatric report is dated March 25, 1986. ( He saw claimant four times during the intervening six months between his first and second reports.) The symptoms remained the same: "tiredness, insomnia, mild crying spells, feeling sad and lonely, and overall emotional dependency." Dr. Llado reported that he had been treating claimant with Xanax 1 mg. h.s.p.o. and psychotherapy. Claimant's daily activities remained limited: "The claimant tends to avoid responsibilities assuming a passive-dependent posture at home." The report added that "most tasks and chores are performed by others" and that "decision making within the family is done with little or no participation by claimant."
 
 
 18
 The report described claimant's mental state in similar terms as Dr. Llado's previous report, but added that "the claimant seemed very anxious, easily startled, complaining of inability to relax, dry mouth, and restlessness." The diagnosis remained the same as the previous report. In his discussion of the diagnosis, however, Dr. Llado stated that, in addition to a poor sense of self, claimant suffered from "concretist thinking, simplistic behavior, labile affect, and easy irritability." He concluded that "the excessive anxiety and extreme degree of social isolation have created a poor tolerance for stress and inability to relate well to others."
 
 
 19
 On February 2, 1986, claimant was evaluated by Dr. Juan A. Guillen, an examining physician. She complained that she constantly felt like crying, that she did not want to see people or to be there and that she wants to work. Her husband reported that she screams at night, that everything irritates her and that she has to be supervised in taking her medications. She was being treated with Tranxene 7.5 mg. H.S. She did, however, visit with neighbors and within the family.
 
 
 20
 Dr. Guillen described claimant as possessing psychomotor retardation, but adequate motor coordination. He reported that she was cooperative and established a rapport with him during the evaluation, although it was not spontaneous. She did not respond to the doctor's initial greeting, avoided visual contact, answered only some of his questions and cried during the interview when talking about her complaints. The report then described claimant as sad, with slow speech, but as possessing "adequate association of ideas, the sequence was logical, coherent and relevant." Dr. Guillen reported that claimant's affect was "appropriate to the content of her thoughts. She was alert, with adequate attention, in contact with reality. She was oriented in person and place, partially in time. Her memory for past events, recent and immediate were adequate."
 
 
 21
 The record also contains a psychiatric report by Dr. Toro dated February 7, 1987, more than a month after claimant's insured status expired. Claimant reported that she was seeing Dr. Llado each month and taking the following medications: Tranxene 3.75 mg. 1 A.M., Tranxene 15 mg. 1 hs. The report stated that claimant's "response to treatment has been good." The claimant described a life of relative isolation, leaving her home only for her medical appointments, and inactivity, helping some with household chores. Claimant reported a decreased ability to do simple tasks and a decreased tolerance to stress.
 
 
 22
 Dr. Toro described claimant's behavior during the examination: "She cried frequently during the interview ... Her eyes had a sad expression. She did not make good eye contact. Her look was directed towards the wall and the floor. Her speech was spontaneous and she spoke in a whining tone of voice." The report concluded that claimant was "coherent, logical and relevant and associated well in her ideas ... Her behavior was cooperative." It also found that claimant "seemed to be preoccupied," looked sad, acted depressed and anxious. "She was oriented in person, in place and not oriented in time as she did not even know the year." Dr. Toro described claimant's remote memory as deficient, though not her short term or recent memory. He found her attention span to be adequate, but her concentration deficient. The diagnosis was dysthymic disorder with anxiety.
 
 
 23
 On February 18, 1987, Dr. Luis Sanchez Raffuci, a psychiatrist, completed a Psychiatric Review form and a Mental Residual Functional Capacity Assessment form based upon his examination of claimant's medical records. He concluded that claimant suffered from an "affective disorder" characterized by "depressed mood, poor motivation, somatic preoccupations and diminished concentration." Dr. Sanchez determined that the severity of claimant's impairment did not meet or equal the ones listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 and did not prevent her from performing substantial gainful activity.
 
 
 24
 Dr. Sanchez' assessment of claimant's mental functional capacity was that claimant's ability to remember detailed instructions was moderately limited by her depressed mood and diminished concentration, but that the other functions in the "understanding and memory" category were preserved. He reported that she was markedly limited in her "ability to carry out detailed instructions," and moderately limited in her ability to "maintain regular attendance and complete a normal work week without interruptions." In terms of "social interaction," Dr. Sanchez determined that most functions were preserved, but that her depressed mood and poor motivation moderately limited her "ability to interact appropriately with the general public and the ability to respond appropriately to criticisms from supervisors." In the "adaptation" category, all claimant's functions were preserved.
 
 
 25
 At the first hearing before the ALJ, Dr. Nogueras summarized the claimant's medical records and gave his opinion of claimant's condition. He noted that although Dr. Llado's September, 1985 report diagnosed claimant as having a "severe and chronic" condition, Dr. Llado's description of claimant's mental state was of a condition that was only "slight to moderate" in intensity. Dr. Nogueras referenced the list of claimant's adequate functioning factors included in Dr. Llado's report. In response to questioning by the ALJ, Dr. Nogueras concluded that claimant suffered from a dysthymic disorder of moderate intensity. He added that the condition has worsened over the relevant period, increasing from slight to moderate intensity. On cross examination, Dr. Nogueras confirmed that claimant's mental condition did not meet or equal the mental impairments included in the Secretary's Listing. He stated that claimant's crying spells during the interviews implied an emotional variability which "if this was her usual behavior in a work environment" might present an obstacle in terms of her job performance.
 
 
 26
 The record also includes a letter from Dr. Elias Jimenez Olivo, dated February 17, 1990 and submitted at the time of the supplemental hearing. Dr. Jimenez' treatment of claimant began on November 14, 1987, almost one year after claimant's insured status had expired. He concluded that claimant's symptoms "are compatible with a diagnosis of Chronic Dysthymic Disorder" and that she was taking the following medication: Limbitrol 10-25 H.S. and Elavil 10 mgs. bid. Dr. Jimenez' opinion was that claimant was "not fit to engage in any type of sustained and substantial gainful activity."
 
 B. Physical Impairment
 
 27
 Claimant's 1985 application for disability benefits did not base disability on any physical problems. A nervous condition alone was described as the disabling condition. In claimant's Reconsideration Disability Report dated February, 1986, however, she reports that since 1981, she has had a "leg problem with bad circulation, and 'espuelones' in both feet" and that she "can't stay too long standing or walking."
 
 
 28
 In March, 1980, claimant consulted doctors at the State Insurance Fund (SIF) regarding pain in her right lower leg and foot and numbness in her middle toe, which she had been experiencing intermittently over the past four to five years. Laboratory tests and x-rays of the right leg and foot were normal. Claimant apparently returned to the SIF doctors in July, complaining of pain in her right leg, including her knee. She was referred to Dr. Rolando Colon Nebot, an orthopedist. All tests indicated that the leg was normal and found no evidence of osteoarthritis and no edema or effusion of claimant's right knee and range of motion within normal limits.
 
 
 29
 In the reports prepared in connection with claimant's application for state disability benefits, claimant was diagnosed first with arthritis in her right knee and circulation problems, by Dr. Valazquez, who treated claimant between October, 1978 and March, 1980. A second report was prepared by a doctor (name illegible) who treated claimant from September, 1981 through November, 1982 for "pain in both heels." The diagnosis was of bilateral calcaneus spurs. That report stated that the "condition does not improve with the use of prosthetic shoes nor with the injection of steroids or analgesics, only improvement is with rest." The physician noted that the claimant "can't remain standing over 1/2 hour continuously due to the pain in the heels." Finally, Dr. Coker reported that he treated claimant from August, 1982 through November, 1982. The diagnosis was also of calcaneal spurs in both heels. Dr. Coker reported prescribing analgesics and recommending weight loss. There was "no improvement" in response to the treatment.
 
 
 30
 Dr. Sandoz's psychiatric report indicated that claimant complained of "pains in both lower extremities." Claimant added that "those pains started very slowly and gradually they increase in intensity. I feel pains in my legs and then I began to feel dizzy spells especially when I am in crowded places." Dr. Sandoz reported that claimant's "gait was normal" when he met with her on August 27, 1985.
 
 
 31
 Dr. Llado's first report indicated that "claimant allegedly developed an emotional condition as a result of a work-related accident in 1981 when she developed edema of legs due to standing too long as a dining room worker." He noted that claimant had complained of "persistent, severe leg pains, secondary to phlebitis treated by Dr. Labad."
 
 
 32
 The record includes a report by Dr. Miguel A. Marrero Bonilla, an orthopedic surgeon, who examined claimant on July 31, 1986 at the request of the Disability Determination Services. The report indicated that claimant feels pain in her heels when she stands up or walks long distances. Based upon his physical examination of claimant, Dr. Bonilla reported that claimant, who "has marked obesity," walks normally but "sits and squats with difficulty on account of the obesity." He further reported that she had good range of motion in her hips, knees and ankles. The report concluded as follows: "The patient has calcaneal spurs in both heels. X-rays showed in the right os calcis. There is good R.O.M. of the right knee. No swelling."
 
 
 33
 At the supplemental hearing on remand, the ALJ questioned claimant about the pain in her legs. She testified that it began in the right leg but later spread to both legs, and emanates from her feet to her hips. Claimant stated that she was taking Motrin 800 and Flexeril, as prescribed by Dr. Soberal, her treating physician. The ALJ also questioned claimant about her daily activities. She stated that she cooks, with her daughter's help, and washes clothes.
 
 
 34
 Miguel A. Pellicier, a VE, also testified at the supplemental hearing. He stated that claimant's former job as a cook was "medium" in terms of physical demand, involving constant standing and walking. It was a skilled job, but at a low level. The ALJ asked the VE to assume that claimant only has the residual mental capacity for simple non-skilled work, but that she is capable of paying attention and concentrating. The ALJ further assumed that claimant's pain in her legs prohibits her from being on her feet all day and, therefore, that she is limited to light work which permits her to alternate positions at her discretion.
 
 
 35
 Given those assumptions, the VE concluded that claimant could perform the following jobs: garment folder, garment bagger, garment turner, classifier of cut pieces. Mr. Pellicier testified that these jobs exist in the national and local economy. He further stated that other jobs exist which claimant could perform, even if she was required to do sedentary work. In response to the ALJ's questioning, Mr. Pellicier stated that, in general, pain which is severe and frequent affects one's capacity to concentrate and pay attention to tasks performed.
 
 DISCUSSION
 
 36
 On appeal, claimant argues that the Secretary's decision is not supported by substantial evidence. Claimant further contends that her due process rights were violated because the ALJ failed to follow the proper procedures with respect to the following: 1) the evaluation of her disability under the steps set forth in 20 C.F.R. § 404.1520 (1991), 2) the evaluation of complaints of pain required by Avery v. Secretary of Health and Human Services, 797 F.2d 19 (1st Cir. 1986), and 3) the procedure for evaluating mental impairments set forth in 20 C.F.R. § 404.1520(a).
 
 
 37
 The Social Security Act establishes the following standard of review in this case: "[t]he findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive, ... " 42 U.S.C. § 405(g). Therefore, the Secretary's decision to deny claimant disability payments in this case must be affirmed "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." Rodriguez v. Secretary of Health & Human Services, 647 F.2d 218, 222 (1981).
 
 
 38
 The ALJ correctly followed the sequential steps set forth at 20 C.F.R. § 404.1520. He first found that the claimant had not worked since September, 1981. Second, he determined that the combined effect of claimant's mental and physical impairments amounted to a severe impairment. The ALJ next concluded that claimant did not have an impairment or combination of impairments that meets or equals the impairments listed in Appendix 1, Subpart P of the Social Security Regulations. Fourth, he found that claimant's impairments prevented her from performing her past relevant work as a cook.
 
 
 39
 Claimant does not dispute any of the above findings. She takes issue, however, with the ALJ's finding at step five of the sequence, that her impairments do not prevent her from performing any other work in the national economy. Specifically, the ALJ found that claimant had the RFC, physically, to perform light work which allows her to alternate positions at will. He further found that claimant had the REC, mentally, to perform work of an "unskilled, simple nature."
 
 
 40
 Considering claimant's age at the time that her insurance expired (42 years), her limited education and her lack of acquired work skills which are transferable to skilled or semi-skilled employment, the ALJ found that "there are a significant number of jobs in the national economy which [claimant] could perform." The ALJ was assisted in this determination by Rule 202.18, Table No. 2, Appendix 2, Subpart P of the Social Security Regulations and by the testimony of a VE. The ALJ concluded that the claimant was not disabled within the meaning of the Social Security Act at any time through December 31, 1986, the date on which claimant's insured status expired.
 
 
 41
 The ALJ's findings are supported by substantial evidence. First, the ALJ's determination that claimant had the RFC, mentally, to perform unskilled work of a simple nature is supported by the record. Social Security Rule No. 85-15 describes the mental demands of unskilled work as follows:
 
 
 42
 the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting.
 
 
 43
 Although there is conflicting evidence on the effect of claimant's mental impairment on her functional capabilities, the resolution of such conflicts is for the ALJ. See, e.g., Rodriguez v. Secretary of Health & Human Services, 647 F.2d at 222. The records of claimant's treatment at the Arecibo Mental Health Center from 1983 through 1986 indicate that her medication, Tranxene 7.5 mg., helps alleviate claimant's symptoms of anxiety and depression. Dr. Mojica found the claimant to be accessible, cooperative and frank. She was "spontaneous and expressed herself in a logical, lucid coherent and relevant form." Her capacity for memory and judgment were adequate and she was competent to handle her funds rationally.
 
 
 44
 Dr. Llado described his patient as alert, well-oriented, with social judgment, reality testing and thought processes "in tact". Dr. Guillen's examination of claimant yielded a report of adequate motor coordination, association of ideas, attention and memory. He described claimant as alert, "in contact with reality", and oriented in person and place. Dr. Toro found that claimant's "response to treatment has been good." He described her as "coherent, logical and relevant and associated well in her ideas. Her behavior was cooperative." He determined that her short-term and recent memory and her attention span were adequate. Dr. Sanchez concluded that the severity of claimant's mental impairment "doesn't meet or equal the listings and doesn't preclude [substantial gainful activity]."
 
 
 45
 To be sure, as recounted earlier, there was conflicting evidence. In particular, both of claimant's treating psychiatrists expressed doubt regarding claimant's ability to meet the demands of ordinary, gainful employment. Dr. Llado was concerned that claimant's emotional condition made her very vulnerable to the ordinary stresses of employment. Dr. Jimenez, based upon his treatment of claimant between November, 1987 and February, 1990, concluded that she "is not fit to engage in any type of sustained and substantial gainful activity."
 
 
 46
 The record taken as a whole, however, provides substantial evidence to support the ALJ's conclusion that claimant is capable of performing work of an unskilled, simple nature. It was within the ALJ's discretion to determine that, despite the moderate limitations upon certain of claimant's functional abilities, the mental demands of simple work are within her capabilities. Given the support for this conclusion in the record, the ALJ was entitled to reject the contrary opinions of Dr. Llado and Dr. Jimenez. Dr. Nogueras testified that Dr. Llado's diagnosis of a "severe and chronic condition" was contrary to his description of a condition that was only slight to moderate in intensity. Dr. Jimenez' opinion that claimant was not fit to work was unaccompanied by medical analysis and was based on treatment which began after claimant's insured status had expired.
 
 
 47
 At the October, 1987 hearing before the ALJ, Dr. Nogueras stated that if the reports of frequent crying contained in the record represent claimant's "normal behavior in a work environment," this could present an obstacle to claimant's ability to perform a job. The ALJ did not include this characteristic, however, in describing claimant to the VE at the February, 1990 hearing. Although there was conflicting evidence, the ALJ's apparent conclusion that frequent crying would not be claimant's ordinary behavior in a work environment is supported by the record.
 
 
 48
 In her 1985 Disability Application, claimant describes a fairly active routine, including household chores, cooking, shopping with her husband and some gardening. This suggests that claimant was not incapacitated by her crying spells. The report of her behavior at the original interview with the Social Security Administration in 1985 does not indicate that claimant cried. In all of her visits to the Arecibo Mental Health Center from January, 1983 through February, 1986, claimant is reported to have cried only during her September, 1984 visit. Finally, at her August, 1985 appointment with Dr. Mojica, claimant is not reported to have cried.
 
 
 49
 Second, the ALJ's conclusion that claimant is capable of a light work level of exertion provided that she can alternate positions at will is also supported by substantial evidence. The medical records are consistent in their diagnosis of calcaneal spurs in claimant's heels. Taking account of this diagnosis and claimant's complaints that she feels pain in her heels when she stands up or walks long distances and that she is unable to stand for more than one-half hour at a time, the ALJ indicated that claimant cannot perform the full range of light work and must be permitted to alternate positions at will. The VE testified that jobs existed in the national and local economy for a person with claimant's limitations. The VE further testified that even if claimant was limited to sedentary work, there were jobs that she could perform in the national and local economy.
 
 
 50
 Avery v. Secretary of Health and Human Services, 797 F.2d 19 (1st Cir. 1986) interprets the Social Security Administration's current policy as requiring that "when there is a claim of pain not supported by objective findings, the adjudicator is to 'obtain detailed descriptions of daily activities by directing specific inquiries about the pain and its effects to the claimant, his/her physicians from whom medical evidence is being requested, and other third parties who would be likely to have such knowledge.' " Avery. 797 F.2d at 23. This directive has been satisfied in this case.
 
 
 51
 At the February, 1990 hearing, claimant was questioned about her former employment and she described in detail the tasks that she performed. She also described her symptoms of pain. The ALJ questioned claimant about her daily activities, when she began to be treated for her pain, the location and severity of the pain, and how the location and severity of the pain had changed over time. The medical records include reports containing descriptions by claimant of her pain and the ways in which it limits her activities.
 
 
 52
 The ALJ considered these reports, but also noted that the objective medical evidence was inconsistent with a finding of disabling pain. The examination by Dr. Marrero, an orthopedist, "has not shown the presence of any swelling, inflammation or marked range of motion limitation of right knee" the ALJ reported in his February, 1990 opinion. He further noted that "[t]he claimant was treated with analgesics which does not show the presence of any disabling pain." Finally, he noted that claimant was "not observed in any pain" and that she reported involvement in daily chores, including cooking and shopping. These findings are substantially supported by the record as a whole.
 
 
 53
 The ALJ found the claimant's complaints credible only "to the extent that [claimant] is limited to a light work level of exertion." This credibility determination is entitled to deference. Frustaglia v. Secretary of Health and Human Services, 829 F.2d 192, 195 (1st Cir. 1987). The ALJ, taking account of the diagnosis of calcaneal spurs, determined that claimant was further limited because "it is not advisable that she stays walking or standing for prolonged periods." The ALJ's efforts to obtain information about claimant's subjective complaints of pain and his consideration of those complaints were sufficient to satisfy the Avery standard. See Berrios Lopez v. Secretary of HHS, 951 F.2d 427, 429 (1st Cir. 1991) (ALJ adequately considered claimant's subjective complaints of pain where he relied upon diagnosis of mild effusion with no edema and good range of motion in all joints and observation that claimant did not appear to be in pain at the hearing, but gave "some credence to her complaints ... and [found] that the range of light work she is able to perform is somewhat narrowed.")
 
 CONCLUSION
 
 54
 The ALJ's decision is supported by substantial evidence. The medical records of the examining psychiatrists, and the testimony of the medical advisor, support the ALJ's determination that claimant's mental impairment does not preclude her from performing work of an unskilled, simple nature. The medical evidence also supports the ALJ's finding that claimant is limited to light work in which she can alternate positions at will. The ALJ adequately considered claimant's subjective complaints of pain in determining her RFC. Finally, the VE's testimony that a significant number of jobs exist in the national economy which meet the claimant's requirements provides substantial support for the ALJ's decision that claimant was not "disabled" under the Social Security Act. There is no merit to the appellant's claims that the ALJ failed to follow the proper procedures in evaluating her disability and her complaints of pain.
 
 
 55
 Affirmed.